**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Jamie Lee CALMESE,
Defendant-Appellant.**

**No. 43161.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Jan. 19, 1982.

Nick A. Zotos, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., Kristie Green, Steven H. Akre, Asst. Atty. Gen., Jefferson City, George A. Peach, Cir. Atty., St. Louis, for plaintiff-respondent.

KELLY, Chief Judge.

Jamie Lee Calmese appeals from the judgment of the Circuit Court of the City of St. Louis entered upon a jury verdict of guilt of Stealing Without Consent, § 570.-030 RSMo. 1978 [1] and imposition of a sentence of five (5) years in the custody of the Missouri Department of Corrections, § 558.-011.3. We affirm.

This criminal prosecution was instituted by an indictment charging Mr. Calmese, hereinafter "appellant," with the crime of robbery in the first degree, § 569.020.

At trial the evidence adduced by the prosecution supports a finding that the victim, Gerard Weisbrod had an appointment to meet with the owner of a business located on the corner of Park Lane and Thekla in the City of St. Louis on June 4, 1979 at 9:00 a. m., in connection with his duties as an appraiser for the Federal Bankruptcy Court in that city. While he was waiting in his van, which was parked on the east side of

---

1. All statutory references are to RSMo 1978     unless otherwise identified.

Park Lane facing northwardly, for the owner of the business to arrive, he observed a man he identified as the appellant, walking towards him on the west side of Park Lane.

Mr. Weisbrod got out of his van and as he did so he heard a voice behind him, turned around and saw appellant standing there pointing an automatic pistol at him. Appellant ordered him to go around to the front of his van and when he complied with the command, appellant took Mr. Weisbrod's keys, coin purse and wallet containing approximately one hundred sixty-eight ($168.00) in currency. The currency included a one hundred dollar bill which was folded into four sections and an old one dollar bill which had a yellowed back.

The appellant fled from the scene on foot and got away. The police were summoned and arrived on the scene within three or four minutes. Mr. Weisbrod reported the crime to the police officers and gave them a description of the "robber." They put him in the police car, cruised the area, but did not see the robber who had made good his escape.

Shortly thereafter the police officers obtained a description of a car and a license number which they ascertained was issued to a Justin Delaney of Berkeley, Missouri. Detectives of the Metropolitan St. Louis Police Department accompanied by Berkeley police officers went to the Delaney residence and observed the car to which the license was issued parked in the driveway.

The detectives questioned Stephanie Delaney at her home and she advised them that appellant had borrowed the car earlier that morning and had only recently returned it. She then directed them to appellant's residence.

When the detectives arrived at appellant's home they knocked on the door and advised appellant that they were investigating a robbery. Appellant admitted them to his home, identified himself, and when asked about his whereabouts earlier that morning, he answered that he had been home all day. The detectives told him that they'd received information that he'd used the Delaney auto that morning and appellant then stated that he had used the car to take his baby to the baby-sitter's house. Appellant was then placed under arrest because he fit the description given the police by Mr. Weisbrod and his stories were in conflict. He was given his *Miranda* rights after he was placed under arrest.

While in appellant's home the police officers observed a coin purse and a yellowed dollar bill but they did not seize them. However, after appellant was arrested the officers had him clean out his pockets and when this was done a one hundred dollar bill, two twenty dollar bills, and three one dollar bills, all folded into fourths, were seized from among the contents of appellant's pockets.

Appellant was taken to the Sixth District Police Station in St. Louis where, in the course of a line-up conducted there, Mr. Weisbrod identified him as the man who held him up.

Appellant's defense was alibi.

Appellant's first Point is that the trial court erred in submitting to the jury instructions on lesser included offenses.

The trial court submitted the case to the jury with three verdict directing instructions: Instruction No. 5—robbery in the first degree (MAI–CR 23.02); Instruction No. 6—robbery in the second degree (MAI–CR 2nd 23.04 modified by 2.05); and Instruction No. 7—stealing without consent (MAI–CR2d 24.02 modified by 2.05). Appellant argues that it was error for the trial court to instruct on lesser included offenses where the only defense interposed was alibi and where he made no effort to establish the absence of any particular element of the greater crime charged in the Indictment on which he was put on trial. He acknowledged that robbery in the second degree and stealing are lesser included offenses of robbery in the first degree.

■ This point was not preserved for review. Rule 30.06(e) V.A.M.R. specifies "If a point relates to the giving, ... of an instruction such instruction shall be set forth in full in the argument portion of the

brief." Appellant has failed to set forth the instruction he challenges in the argument portion of his brief. Furthermore, both instructions he attacks in this court were tendered to the trial court by his trial counsel and were submitted at his request. "[T]he defendant, having requested the instructions, is in no position to charge error with respect to them." *State v. Swiney*, 296 S.W.2d 112, 116[11] (Mo.1956); § 545.-030 RSMo. 1978.

We rule this Point against appellant.

Appellant also contends that the trial court erred in overruling his motion to suppress statements made at the time of his arrest and in admitting into evidence the testimony of the police officers concerning these statements over his objections.

He argues that these statements were involuntary and were made prior to his having been advised of his right to remain silent and while he was in police custody.

The crucial issue for decision is whether the questioning of the appellant prior to the time he was told by the police officers at his home that he was under arrest constituted "custodial interrogation" requiring the *Miranda* warnings.

"Custodial interrogation" is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise been deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

This court has recognized that there is no hard and fast rule which can be established as to when custodial interrogation begins and that when it does must be determined from the surrounding circumstances. *State v. Williams*, 522 S.W.2d 641, 644[1] (Mo.App. 1975).

Resolution of the question whether the trial court erred in overruling appellant's motion to suppress must be found in a detailed analysis of the evidence presented at the hearing on appellant's motion.

Two witnesses gave testimony at the evidentiary hearing on appellant's motion: Detective Richard Brogan and appellant himself.

Detective Brogan testified that he went to 6822 Eisele Avenue, Berkeley, Missouri, accompanied by Detectives Murphy and Whitting of the St. Louis Metropolitan Police Department and a Berkeley, Missouri police officer whose name he did not recall, in the course of investigating the robbery of Gerard Weisbrod which had taken place about an hour or an hour and a half earlier that same day.

Prior to going to this address in Berkeley, he and the other police officers had gone to the home of Justin Delaney in Berkeley. At that address he spoke to Stephanie Delaney after he had identified himself as a policeman from St. Louis City and told her that he was investigating a robbery. He also advised her that they were given a car description and a license number which had been determined to be Justin Delaney's white over gold Lincoln, at that address, and that was why they had come there. He then inquired whether she or any other member of her family had used the car that morning and also gave her the description of the person furnished to him as the one who robbed Mr. Weisbrod. In response to his question Ms. Delaney said: "Yes, Jamie Calmese just brought the car back." She also told him that Calmese said he needed the car to take the baby somewhere; that he returned without the baby; and he then went home. He asked her what Calmese was wearing and she told him Calmese was wearing a dark brown top shirt and light tan summer pants.

Detective Brogan asked Ms. Delaney where appellant lived and she told him appellant lived a few blocks away. Armed with this information the detectives went to the Eisele Avenue address to further investigate the robbery.

When the detectives arrived at the residence on Eisele Avenue Detective Brogan knocked on the door, appellant answered the door, and Brogan told him that they were policemen investigating a robbery and asked if they could come into the house and talk with him. They entered the house and

appellant was asked his name. He identified himself as "Jamie Calmese." He was then asked if he'd had occasion to use the Delaney automobile that morning. He replied, "No. I have never been out of the house." When this answer was given, Detective Murphy told appellant that he was under arrest and advised him of his "constitutional rights," "the standard *Miranda* rights."

After he was advised of his *Miranda* rights appellant was asked whether he was saying that he was not out of his house using the car and he replied, "That's right man. I have been home all morning." Brogan then advised appellant that Ms. Delaney had told them that he'd used the car to take the baby somewhere and had just returned the car. Appellant responded that he did have to take the baby out, but that he didn't use a car and that a friend picked him up and took him and the baby to his mother's.

When the officers came to appellant's home they had no arrest warrant.

Appellant also testified at the hearing on the motion. According to his testimony he was never advised of his constitutional rights either prior or subsequent to his arrest in his home on June 4, 1979. All he was told, he testified, was to shut up and sit down. He said the police officers tore his house up at the time.

■ Once a defendant in a criminal prosecution has challenged the admissibility of a statement or confession made while in police custody, the burden is on the prosecution to demonstrate that its elicitation comported with controlling constitutional requirements and that the statement was voluntarily made. *State v. Higgins*, 592 S.W.2d 151, 158[7] (Mo. banc 1979).

■ Where, as in this case, the evidence is in conflict, a reviewing court, in determining whether a defendant's statements or confessions were voluntarily made and

were, therefore, properly admitted into evidence by the trial court, first gives due regard to the trial court's opportunity to judge the credibility of the witnesses and in that frame of reference determines whether the trial court's finding of voluntariness is supported by substantial evidence. Id. l.c. 157–158[6].

Clearly, none of appellant's statements which came into evidence in this case constituted a confession; they were denials that he had used the Delaney automobile that morning and whether he had been out of his home that morning.[2]

■ Appellant argues that even prior to the time he was advised that he was under arrest, he was deprived of his freedom in a significant way because the finger of suspicion had already pointed directly at him as the perpetrator of the robbery under investigation since, at the time the police officers approached his residence, they already possessed (1) information that he had been in possession of the Delaney vehicle at the time of the robbery, and (2) a description of the robber furnished them by the victim together with a description of the clothing worn by appellant at the time he returned the Delaney automobile related to them by Ms. Delaney and which matched the description of the clothing worn by the robber given them by Mr. Weisbrod. Therefore, when appellant opened the door and the detectives instantly recognized that he fit the descriptions they had already obtained of the robber, appellant argues that there then existed probable cause to arrest him and the police officers should have read him his *Miranda* rights prior to asking him any questions.

Appellant further argues that if the information alone did not trigger the requisite warning, those factors, coupled with his identifying himself as "Jamie Calmese," did, because he was then "clearly being deprived of his freedom in a significant way."

2. At trial appellant's alibi was that at the time of the robbery he was walking to a pharmacy about two blocks from his home in Berkeley to pick up a prescription for his daughter. After picking up this prescription he walked to his home and remained there until the police arrived. These activities occurred between 9:10 a. m. and 10:00 a. m.

The state responds that when appellant was asked his name and his whereabouts that morning the police officers were still investigating the crime and questions asked demonstrate this. It was the physical description of the robber; the corroborative information furnished by Ms. Delaney relative to appellant's physical characteristics and his use of the Delaney car, together with his inconsistent statements, that furnished the probable cause for appellant's arrest and triggered the necessity for the *Miranda* warnings before any further questions were asked.

We conclude there was no error in the trial court's denial of appellant's Motion to Suppress his statements made to the police officers in his home on June 4, 1979.

We arrive at this conclusion because the testimony of Detective Brogan, which the trial court chose to believe, as it had the right to do, demonstrated that the police officers were still investigating the robbery when appellant's responses to their questions were made and he was not then deprived of his freedom in a significant way.

While they possessed information which caused them to come to the door of appellant's home to seek verification of said information we seriously doubt that at that time the detectives had probable cause to effect appellant's arrest.

According to Detective Brogan it was not until after appellant gave them conflicting statements relative to his whereabouts that morning that the detectives believed they had probable cause to place appellant under arrest. At that point they opined that they had probable cause to effect an arrest and they informed appellant he was under arrest and gave him the *Miranda* rights.

See *United States v. Hall*, 421 F.2d 540, 545[5] (CA2 1969).

The United States Court of Appeals recognized the problem faced by police officers in reaching the decision when probable cause to make an arrest exists which, we believe is apropos here, when it said:

> ... The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall short of the amount necessary to support a criminal conviction.

*Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966).

The testimony of Detective Brogan also demonstrated that these questions were asked in appellant's home after he had admitted the detectives who identified themselves as police officers, told him why they were at his doorway and that they wanted to talk with him about a robbery. There was no evidence that the detectives had their weapons drawn nor that they threatened him. The coercive atmosphere of "custodial interrogation" which triggers the necessity for the *Miranda* warnings was not present at the time appellant made the statements he sought to have suppressed. Nor was there any evidence that appellant was at the time deprived of his freedom in any significant way. What the detectives would have done had he attempted to leave the premises during the course of their questions is immaterial in a determination whether appellant was in custody or otherwise deprived of his freedom in some significant way so as to trigger the requirement for *Miranda* warnings. *United States v. Hall*, supra, l.c. 546[6].

We rule this point against appellant and the judgment of the trial court is affirmed.

CRIST, P. J., and REINHARD and SNYDER, JJ., concur.